We'll hear argument this morning in Case 17-333, Benisek v. Lamone. Mr. Kimberley. Mr. Chief Justice, and may it please the Court, all nine Justices in Vieth v. Jubalier agreed that partisan gerrymandering can violate the Constitution. The principal question presented in this case is whether this Court has the Article III authority to do anything about it. We submit that it does under the First Amendment. According to this Court's First Amendment retaliation and ballot access cases, government officials may not single out particular individuals for disfavored treatment on the basis of the views that they have expressed at the ballot box in prior elections. Ginsburg. Mr. Kimberley, may I ask you a kind of preliminary question? I take it it's much too late, even if you are successful, for there to be any change for the 2018 election. And if that's so, then we're only talking about a preliminary injunction here, right? Kimberley. We are talking about a preliminary injunction, Your Honor. That's correct. Ginsburg. So how would you be irreparably injured by the denial of a preliminary injunction if the earliest, assuming you're right, redistricting to go into effect would be 2020? Kimberley. Well, Your Honor, we don't concede for purposes of this appeal that it's too late to enter relief in time for the 2018 election. Congress has enacted a statute that deals with these sorts of circumstances that this Court addressed in Bush against – I'm sorry, not Bush against Farah, but the statute is 2 U.S.C., 2 A.C. Kennedy. Is there anything in the record to indicate that experts will tell you, oh, this is possible? Kimberley. That it's possible to enact a new – Kennedy. That it's possible to comply with the injunction in time for the 2018 election. Kimberley. There's nothing in the record about that, Your Honor, but that also isn't an issue that the district court has been given an opportunity to address yet. Kennedy. Well, but you're asking us to then just assume it. Kimberley. Well, as a matter of fact, Your Honor, I think what we're asking for is just a remand for reconsideration of the preliminary injunction motion in light of what we take to be the proper legal standards. And so if on – Sotomayor. Given the equitable principles involved in an injunction, this is – you waited an awfully long time to bring this suit from the change in 2011, was it? Should that factor into our consideration of whether to uphold or not uphold your requests? Kimberley. So I think there are two things to say about that, Your Honor. The first is we don't think that that is an issue that's really properly before this Court, unless this Court concluded that it would be an abuse of discretion not to deny the preliminary injunction on that basis. That is a function of the abuse of discretion standard of review, and the fact that the lower court hasn't had an opportunity yet to address that question. Scalia. I don't think it's not – it's not just that equitable factor. There are other factors under the preliminary injunction standard, including irreparable harm. And because of your delay, elections have been held under this district in 2012, 2014, and 2016, right? Kimberley. Well, I – it is true that those elections have been held. I would not say that it's attributable to our delay in bringing the suit. Scalia. Well, no, but it's evidence of the question of whether you've been irreparably harmed, that you've been willing to let go. The elections in 2012, 2014, and 2016 suggest that maybe 2018 you're not going to be irreparably harmed in a broader sense. Obviously, you argue you would be in this particular election. But if you've been willing to accept that harm in three different cycles, I don't know if we should get concerned about irreparable harm for one more. Kimberley. Well, I guess I have a few things to say about that. The first is this lawsuit was initially filed in 2013, true, after one election had taken place. But district courts have entered injunctions against the enforcement of congressional districting maps after elections have taken place many times in the past. So – Roberts. Well, if you look at – you did not file the suit presenting this particular theory of the case until 2016. No. Our position is that this theory of the case has been in the case from the beginning. This was a premise of this Court's reversal and remand of the Fourth Circuit back in 2015 in Shapiro v. McManus, that this claim was in the case, that it was a claim that had not yet been foreclosed by any majority opinion of this Court, and therefore that it was a basis for convening a three-judge district court. It's true that it did not claim a majority of the attention of the original complaint, but there's – this Court could not have reached the decision that it reached in Shapiro v. McManus if this claim had not been in the case from the get-go. I still don't understand what you want to have take place in practical terms. You want this case remanded to the district court, and you think that after the cases we remand the case to the district court, there will be time to adopt a new map to be used in the 2018 election? Your Honor, I – the short answer to that question is that that is an issue for the district court to decide. It is, as I say, not something that we have conceded, and I think it's conceivable that the case could get back down to the district court in time for some form of relief. Certainly, the district court could conclude that there isn't enough time and allow an election to take place under the map as it's drawn. It might look for some sort of interim solution under 2 U.S.C., 2 A.C. What would that – what would that – An order by this court indicating, oh, there might be time is going to upset settled expectations, there's – people are planning campaigns and so forth. It would be highly – are you suggesting that it would not be disruptive of the current election scheme and the current election districting for this court to remand, to consider whether the map should be changed at this late date? Well, I think it would perpetuate the same sort of uncertainty, frankly, that's been hanging over Maryland politics from the pendency of this suit all along. I don't deny that, Your Honor, but I don't think this court has to actually take a position on the time in question one way or another. What we're asking this court to do is evaluate the legal principles that the district court announced in its decision denying a preliminary injunction motion, to correct them if it sees fit to correct them or to affirm them otherwise. Well, it's not simply a question of – we have held it in a preliminary injunction context. You do not have to consider the merits if you think the equities and the irreparable harm questions cut against the grant of a preliminary injunction. Well, that's true, but again, that would be a question, I think, for the district court in the first instance. The question whether or not – Your Honor, you're asking us to decide the merits and determine from that whether there's been an abuse of discretion. I understand that. Right. And what I'm suggesting most, I guess the strongest case is the Winter case from a few years ago, where we said if the equities and the harm question cuts strongly in one direction, we don't have to consider the merits at all without determining that there has or hasn't been an abuse of discretion. Well, I'm – I don't recall what it is exactly the district court in the Winter case, with which I'm familiar, before this Court. I don't recall what the district court in that case had done. If the district court had reached each of the individual issues, surely the Court can pick out among the issues that the district court resolved which it wants to base its decision on. And surely that doesn't mean that the district court can't pick out among the issues that the district court resolved which it wants to base its decision on. And I think it's part of your challenge today to explain to us why we should pick out the hardest one. Well, and the short answer is because that's the one on which the district court based its decision. If this Court were instead to pick out a different factor from the preliminary injunction test and decide that it wants to affirm on that basis, it would basically be taking the discretion of the district court and taking it for itself to exercise. Sotomayor, let me ask you a practical question. This is a denial of a preliminary injunction. You still have a merits trial to go through or not? That also yes, we do, yes, unless there's a summary. Can you go through that trial without a ruling from us? And if not, why not? Judge Niedlmeyer said that there were many open issues in this case, not the least of which, what was the motivation of the governor and his committee for the change at issue? Would that obviate some of the merits questions that are before us if you don't prove that first prong? You have fairly strong evidence to show that. Is your weakness in the other prongs? Well, we don't think we have weakness in any of the prongs. No, assuming we accept your test. I agree. But assuming we leave it the way it is, what happens? Well, I think what the concern that we have is if the case, so imagine the district court does not enter summary judgment and the case proceeds to trial. It will proceed to trial on what we take to be a fundamentally misguided view of what we have to prove to establish a First Amendment violation against partisan gerrymandering. What the district court indicated at the preliminary injunction hearing is that it would be open to reopening discovery, allowing us basically to conduct a massive district-wide survey of voters to determine whether or not they would have voted one way or another, all because the district court believed that the primary question on burden is whether all of the electoral outcomes in the district under the MAP are attributable. Well, let me ask you about your legal theory, then, because I probably don't understand it. But if I understand it, I really don't see how any legislature will ever be able to redistrict. So let's say that a legislature is drawing a particular MAP or a particular district. Let's say it's a MAP, and they say that they have two possible plans that they're considering, and they both have very low population deviations, exactly the same. And the districts in both are compact. The territory is contiguous. But they say, look, did Plan A gives our party a more than de minimis advantage, and Plan B gives the other party a more than de minimis advantage. So let's pick the one that favors our party. Now, in your view, that's unconstitutional, I gather. Well, if what the MAP drawers are doing is looking at the way that individuals have voted in the past, and on that basis attempting to make it more difficult for them to achieve electoral success moving forward, that is the specific intent, and there is a burden imposed as a consequence, it may well be that that would be a violation. But hasn't this Court said time and again you can't take all consideration of partisan advantage out of districting? I want to be very clear that our theory does not require taking all partisan advantage, consideration of partisan advantage. Well, I don't see how your theory is any different from that, other than a de minimis partisan advantage. So there are two ways in which it's different. The first is there are a range of considerations that MAP drawers will take into account that bear on the question of partisan advantage. Yes, I know. You have protection of incumbents and preserving a district that has a particular facility in it and a few other things, okay? In my example, none of those apply. Your answer is that favoring the political party of the majority in the legislature in a way that's more than de minimis is a violation of the Constitution. In two consequences that — in two circumstances that wouldn't be the case. So the first is we also take the position that strict scrutiny applies, and so it certainly is the case that MAP drawers could consider this sort of information if it's narrowly pursuing a balanced MAP or pursuing competitive districts. Well, what would happen if you have the Orange Party and the Green Party? The Green Party is in a minority, Orange 45 and Orange Party 55. Then because of natural population shifts or building new plants and so forth, it switches. Could the legislature say at this point we want, in order to have a congressionally balanced delegation, change the districting in order to accommodate the new majority? It seems to me that that would be definitely to retaliate against a certain voter, the voter for the Orange Party who used to be in the majorities, now in the minority. He's got a complaint under your view. Well, unless, as Your Honor suggested, it's in pursuit of balanced MAP drawing, I think in that circumstance we've taken the position throughout this litigation that's the case. But is your theory that that would be a compelling interest that could defeat strict scrutiny? In other words, the way I understand your theory is that you would put the State in that position to the test of saying this is a compelling interest, this is the only way we can achieve that interest, and sort of put it through the strict scrutiny hoops, even when the State, you know, wants to achieve balanced districts or wants to undo a former gerrymander. So you would still put the State through a very strict scrutiny test in that case? Well, I think the answer is yes, Your Honor, but I think in this circumstance strict scrutiny could do real work, just as this Court in the racial gerrymandering context has generally tolerated the idea that consideration of race is a compelling – is a necessary means of achieving the compelling end of complying with Section 2 of the Voting Rights Act. Well, how would you ever satisfy strict scrutiny in a case like this? In other words, it would seem to me that there are so many alternative approaches that the idea of saying this one way of achieving a particular result was the only possible way. I don't think under the strict scrutiny approach, I don't think it's necessarily that that particular district, as it's strong, is what would have to be necessary. I think, for example, in Arizona, the Independent Redistricting Commission there is told to pursue competitive districts. In order to pursue competitive districts, it's likely, I think, that considering this kind of data is necessary. So it's – But, I mean, your theory is that the legislature acts with a vengeful intent to punish people for the exercise of their First Amendment rights, right? The way we put it is disapproval of their past voting history, yes. And they're going to say that in some circumstances that's going to be okay, even though it applies strict scrutiny. It's going to be okay for them to burden their First Amendment rights. Well, I think we would take the position, just as in any other First Amendment context, that, yes, if consideration of past voting history is necessary to pursue that compelling governmental interest, we tend to think that balanced maps and competitive districts would get that role. But when you start with a district that's been skewed, and you take that as the baseline and say any deviation from that skewed districting has to get strict scrutiny, there's something wrong with that. I mean, isn't the State able to say, in the past this was a gerrymandered district and now we want to undo the gerrymander? And then people who are left out will say, now we've been deluded. We've lost the clout that we once had. I mean, isn't there something wrong with using the district as it now exists as your starting point? I think there are three things to say about that, Your Honor, and I recognize that this is an important point in the case, so I'd like to be sure to hit all three. The first is our focus on the immediately prior district, the form of the immediately prior district was a reflection of what this Court said in Karcher v. Daggett about districts historically having a core around which changes are made. That accurately describes the 6th Congressional District, which historically has comprised northwest Maryland and around which changes have been made, but that historical core has been preserved. I think probably analytically the more consistent way to think about it is the first precondition under the Jingles framework for approaching racial vote dilution, which is the question whether the targeted minority is capable of forming, is sufficiently numerous and geographically compact to form a majority of a reasonably drawn district. We knew in this case that that was true because, of course, between 1990 and 2010, Republican voters had formed the majority of a reasonably drawn district. That's why in this case we had focused on the way that it had been drawn before. But in a circumstance where the Court is looking at whether there has been a maintenance of a prior gerrymander, we think probably the more consistent way to look at it doctrinally and analytically is as I just described under the first prong of the Jingles preconditions. Sotomayor, is this, is yours the only test you're proposing? In other political gerrymandering cases, do you see other tests being a possibility? Is the question whether this is the only? In this lawsuit, this is the only test. I didn't ask that. In other gerrymandering cases, do you see the applicability of any other test? You have a lot of amici with different tests, the ACLU. Sure. The others have proposed tests that would address some of Justice Kagan's concern, the entrenchment tests, the durability tests, that sort of thing. Sure. Why did you disavow those? Do you lose under those? Well, our other issues. Or do you think yours is just easier? Well, there are two reasons. It was our understanding when we filed the amended complaint back in 2015 that we would not have made out a claim under a number of those other tests. And we were concerned because the focus here really was on the 6th District and not the map as a whole, that it just wasn't an apt way of thinking about what happened in Maryland. The second reason that we focused on it is because we were concerned about the notion that under these other tests that the injury that was inflicted upon Republican voters in Maryland's 6th Congressional District could be viewed as being offset by allowing, effectively gerrymandering other districts in other parts of the State to offset the dilution of votes in the 6th. And to your theory, do you think the Democrats in the 8th District have a complaint? No. I think that's a good example of what would be a de minimis effect. It's true that moving Republicans out of the 6th and into the 8th and Democrats out of the 8th and into the 6th did in sort of a technical sense dilute Democratic strength in the 8th District. The DPI there went from 72 to 60. Both are extremely safe Democratic seats. As a practical matter, it made no difference to the outcome of the election in the 8th District. It was just a little bit. Presumably, it wouldn't satisfy the first part of your test, that this would have been done with a vengeful intent to get those Democrats. And that's exactly right. That's the other way to look at it, is it would just be an accepted political consequence and not the specific issue. The district is. We have many briefs. We have three cases. One, too, you know, is Wisconsin. There's Maryland. And the one we are holding, I think, is North Carolina. And there are you've read those briefs probably. Yes. And they all have slight variations on different themes. And I think you're right when you the same theme maybe, but variations. And obviously, the problem is what you started with. It seems like a pretty clear violation of the Constitution in some form. To have deliberate extreme gerrymandering, the Court said things like that. But is there a practical remedy that won't get judges involved in every or dozens and dozens and dozens of very important political decisions? Or what would you think of taking the three cases and setting them for re-argument on the question of standard and that we'd have all three variations in front of us and we would enable people who have an interest in this subject generally to file briefs and we'd see them all together and they could attack each other's standards or they could support each other's standards or they could attack any standard. But there we'd have right in front of us the possibilities as thought through by lawyers and others who have an interest in this subject. You are right. Obviously, this Court has before it those three cases. I do think it makes sense to think about them all together because I think the consequences of not adopting one or the other theory is alarming and ought to be alarming to anybody. I might add that I think today, as the Campaign Legal Center laid out in its brief in this case, a challenge to Maryland's partisan gerrymander in 2011 would likely succeed under the approach that they've taken. Conversely, I think the Wisconsin map could be invalidated under our approach. It would require a different theory and different evidence, perhaps different plaintiffs, but it's certainly imaginable that the Wisconsin map could be invalidated under our theory. Breyer, but I raise it not for that reason. I raise it because I want to think if there is some harm in doing that that I haven't thought of. Is there some reason, would it be harmful to somebody? Because I do see an advantage. You can have a blackboard and have everyone's theory on it and then you'd have the pros and cons and then you'd be able to look at them all and then you'd be able to see perhaps different ones for different variations and, you know, that's maybe there are different parts of gerrymandering that rises in different certain, da, da, da. You see the point. Okay. You can't think of a reason not to do it. Well, I mean, the immediate reason I suppose would be the intervening 2018 elections. But if the Court is disinclined to think that there is time for a remedy in any event, then perhaps there wouldn't be. That certainly isn't an issue that we're willing to concede, as we say. I think it would be an issue for the district court in our case on Fremont, just as it would be in Wisconsin or North Carolina. Ginsburg. What do you think would be permissible? You said your theory allows for de minimis exceptions. Right. So what falls in the de minimis category? Well, I think a good example would be, as I was just describing to Justice Sotomayor, it would be what happened in the 8th Congressional District. We have the That's not de minimis. You're saying there's no burden at all. You're saying there wasn't an intent to burden the Constitution. Well, I think you can get at the 8th. That's different than de minimis. But I think you can get at it both ways. It certainly is also the case that I think you can eliminate that claim under the intent prong. I think you could also eliminate it under the burden prong. Well, may I give you a hypothetical that gets to Justice Ginsburg's question? Suppose you had a district and there was a reapportionment and we realized we have to add 15,000 votes, voters to this district. And they looked at the numbers and they said, you know what, if this is a solid Republican district, but if we add 15,000 voters from a Democratic area, we're going to turn this into a highly competitive district. Would you now force the State to meet a strict scrutiny burden on that, wouldn't you? I think in that, sir, it sounds like what's going to We are taking 15,000 of the bluest blue voters and we're parking them in this district in order to convert the district from a safe Republican district to a competitive district. How do you analyze that? I think, and just to be clear that I have it straight, if the point is that lawmakers in We want another Democratic. In Annapolis, exactly. They say we disapprove of these voters electing a Republican in this district. We're going to move these Democrats in to prevent them from doing it again in the future. Yes, I think that that could be, again, depending on the strict scrutiny question and depending also on the burden question, that could indeed be a violation of our theory. Counsel, one question I have about causation for you. Before the district court, it appeared that you conceded that you had to prove but for causation, that but for the alleged gerrymandering, the outcome would have been different in these last three elections. And the district court expressly rejected a lower standard, rejecting some metaphysical could-be burden in favor of the but-for-cause test. In this court, you seem to now be backing away from the but-for-cause requirement, as best I can tell, in favor of something the district court might have described differently. And I wonder, how could it be an abuse of discretion for the district court to have proceeded on the basis of a concession before it that you're now backing away from? Well, to be clear, we believe that but-for causation is an element of the claim. We just don't think it's ours to prove. We think under Mt. Healthy, burden shifting. I understand that. But before the district court, you took the position that you had to prove it. According to the district court's opinion, according to your brief, it's saying our burden is to show. Right. No, that's so that that is a line taken out of a brief that's really twisted to mean 180 degrees of where the action is. So the district court twisted your concession? Your Honor, it misunderstood what we were saying. We said very clearly in the context in which that sentence is taken that we did not have to prove that every election forevermore would be no. What it said was, it didn't say that. So I think you're twisting perhaps what the district court said. What the district court quoted you as saying is our burden is to show that purposeful dilution was a but-for cause of the losses in 2012, 14, and 16. And, Your Honor, that was a description of the factual arguments that we had made in the case about how it was that we were describing the burden at that point. That is not something that we have. All right. How can it be an abuse of discretion for the district court to have relied on that concession? Because that – I mean, that concession is – first of all, it's not a concession. It's taken out of context, as I say, to mean something other than what it meant. But I think it's wrong to say that that is the basis on which the district court based its decision. It based its decision on the view that in order to prove an actionable burden in any partisan gerrymandering case, the plaintiffs have to come forward and show that electoral to be changed until the map is altered. And that is not what this Court's – that is not a position that we took in the district court. One more along these lines for you is in factual findings 11 and 12, the district court found that plaintiffs had conducted no statistical sampling to show an alternative cause might not have been responsible, namely that people just preferred the candidate. Right. And it had nothing to do with gerrymandering. How do we – how do we address that factual finding and call it an abuse of discretion, the decision here when plaintiffs failed to rule out other potential causal factors for the results here? Well, there are two things to say about that. The first – and I think the easiest way to address it is through the legal question of whether or not healthy burden shifting applies here, whether it's on the State when a prima facie case of discrimination has been made to come forward with neutral justifications for the action that it took. If we're right about that question, then it wasn't our burden to put that evidence before the Court in any event. But I think the other way to think about it, to call it abuse of discretion, is frankly because it's clear error. The Court didn't take account of the strong evidence that we have about the reliability of the metrics that the map drawers themselves used to work the gerrymanderer in this case. That includes the PVI and the – well, the map drawers didn't rely on the PVI, but they relied on the DPI. We have evidence uncontested in this case that those metrics are reliable ways of predicting electoral outcomes. That they are reliable is a premise of partisan gerrymandering to begin with. If they weren't reliable, we wouldn't see partisan gerrymandering at all because it would be a fool's errand. We know that not to be the case. We have strong evidence in the case demonstrating that more likely than not the electoral outcomes and the dilution of votes in the district was attributable, as common evidence, to the fact that map drawers drew the lines. And so I think you have the legal error under Mt. Healthy Burden Shifting, and as to the factual question, it's simply a clear misreading of the record before the district court. I may reserve my time. Roberts. Thank you, counsel.  Mr. Chief Justice, and may it please the Court. The plaintiff's First Amendment retaliation claim fails to provide a manageable standard for evaluating partisan gerrymandering for three principled reasons. First Amendment retaliation does not even try to answer the perennial question of how much is too much politics in a redistricting process that this Court has called inherently political. Oh, I don't know. He says not at all. He says it's too much if that's all you're doing. Well, that's basically as I read his argument. If that's all you're doing, then it's too much. Now, under that test, he might lose, because you're claiming there were other reasons for this. But that's an issue of fact for the jury, I think. You have some pretty damning evidence that it might not have been. You have your own mayor saying, your own governor, pardon me. He used to be my mayor. Your own governor saying that he felt duty-bound to ensure that his party won. And there are basically statements to that effect here. So that tells you, that gives you a standard. You may not like it, but it does give you a standard. Well, two things, Your Honor. One is, elsewhere in the brief, plaintiffs disavow that they have to show how much is too much. They actually say that in words. Two, that kind of intent. Well, how much is too much is when, I think, balled up in the question of which they're, I grant you, they're a little bit equivocal of who bears this burden. But they are saying that we have to show that there's some form of entrenchment, that the intent is to ensure that only Democrats will be capable of winning in this district for the life of this census or the life of this boundary. So you have a, you have some form of too much. But the, what they're really relying on is the intent, which they would equate with retaliation. But it's the same intent which the Court recognized in Bandemer is ever present. Kagan. Well, Mr. Sullivan, let's say you're right, that they have not shown us how much is too much, that they have suggested that in any form, when there's partisan advantage, the courts should be intervening. But we don't have to say something like that to deal with this case, because however much you think is too much, this case is too much. I mean, I think. You'll tell me I'm wrong, but as Justice Sotomayor said, you know, from the governor, from Congressman Hoyer, people were very upfront about what they were trying to do here, which was to create another Democratic district. And they did that. Only 10,000 people had to be removed from this district as a result of one person, one vote. What the Maryland legislature did was to shuffle 360,000 people out and bring in 350,000 people. The result of that is that the district went from 47 percent Republican and 36 percent Democratic to exactly the opposite, 45 percent Democratic and 34 percent Republican. I mean, how much more evidence of partisan intent could we need? Well, you might want intent to create something other than a competitive district, which is what Maryland created. It went from a safe Republican, plus 13 Republican, to a plus-two Democrat. And in nine and. Plus-two, you're referring to the single election? Is that what you're referring to? Well, Cook evaluated the first election after the redistricting, which is the most important one where you can judge the effectiveness. I mean, Democrats have now prevailed in three straight elections, including in an election which was a wave Republican election. So, the effects were exactly what the intent would suggest. A long-standing Republican incumbent is unseated by a Democratic newcomer who withstands a wave election, who prevails three straight times. I mean, it appears that the Maryland legislature got exactly what it intended, which was, you took a Republican district, like a safe Republican district, and you made it into not the safest of Democratic districts, but a pretty safe one. Well, no, it's not safe. It was judged competitive. And in that first election, 2012, the incumbent Republican had seven countum sedum, seven opponents in the Republican primary. The total vote for those opponents exceeded the vote for the incumbent. Those seven candidates did not run for office, presumably because they thought it was a waste of time to run for the seat as a Republican in the 6th District. They considered it to be competitive, and so they ran, as we often do. Competitive, the idea that's being advanced is extreme gerrymandering. Okay? A hundred percent is extreme. No other reason for doing this other than partisanship. That's an example of extreme gerrymandering. And the election result changed. That's an example of harm. And there is nothing else put forward, okay, except you did put something forward. There's been gerrymandering in the past. We're trying to cure it. Something like that. We've seen that in other cases. Okay. Say no. The last reason is not good enough. You have to start somewhere. Second, there's an example of an effect. And three, it's a hundred percent partisan. That's the reason. That's extreme. Now, could we say that? Yes, I think we could. But the problem is that's not going to solve other cases and we'll never have such a record again. I mean, the people who do the gerrymandering are not stupid. And they will never have such a record. And therefore, we will not do much to deal with a problem of serious dimensions that is national. All right? So what do we do? Just say goodbye? Forget it? And as you know, you've read these briefs. If you think what's happened now is something, wait until you see those computers really working. You've read that. I've read it. Okay. What do you think? Well, I don't know if I'm smart enough to exceed all of the knowledge that's been applied to this question by this Court for a generation. But we do think that the Equal Protection Law, which is what Baker v. Carr looked to when it first embarked on this project to have the courts oversee redistricting, provides the best hope for a standard for it to emerge. In First Amendment, there are cases outside of retaliation. Retaliation has never been used to evaluate a statute that's otherwise retaliated. Okay. Say Equal Protection Law. You get to the same place. You see, because we have 100 percent here, or that's the record could be read that way. You get to the same place. That's why I was thinking you've got to get all these standards lined up together, you know, and you have to have people criticizing each one back and forth and see if any of them really will work, or some work in some cases and some work in other cases, and it depends on the type you have. I mean, that isn't squarely addressed by the lawyers because they're focused on their one case, et cetera. What do you think? Well, there hasn't been 100 percent showing that was the only purpose here. Eliminating the crossing of the Chesapeake Bay, which had happened in the early 90s, caused the need to move 125,000 people in the first district alone. So, and as everyone who — all the experts who testified in this case in the deposition acknowledged that if you move one line, it affects the whole map. Suppose the Maryland Constitution had a provision that required that partisan advantage for one party be the predominant consideration in any district. Lawful or not? That would be viewpoint discrimination, Your Honor, which the Court would evaluate on the face of the statute. But here we have a facially valid statute that doesn't have any content on that line. Well, you can have viewpoint discrimination without challenging something on its face. It goes either way. Well, in Christian Legal Society v. Martinez, the Court pointed out that if its content  Kennedy, this is a hypothetical viewpoint consideration and what happened here, not viewpoint consideration. I don't understand the difference. Well, it comes down to how the Court evaluates that kind of statutory challenge, which it has traditionally done on the face of the statute. My question to you was, A, was that invalid, the hypothetical? I believe, if I can conclude that your answer is no, that's not constitutional. Yes, that on the face of the statute. How is this case different? Well, we don't have a statute that establishes a preference for one party or the other. Well, but I mean, the redistricting is a statute, isn't it? Yes. Well, that seems to be a statute that prefers one party over another. But on its face, it's a series of meets and bounds. It's the longest, most boring deed you've ever written. It doesn't have any particular content. Well, suppose, Mr. Sullivan, that the Maryland legislature passed a statute. What is — Maryland is about a 60-40 Democratic-Republican State, is that right? Just about. Democratic. Yes, 60-40. Suppose the Maryland legislature passed a statute and said, in the next round of reapportionment, we're going to create seven Democratic districts and one Republican district. I think it would have a similar result to the question from Justice Kennedy. It would be on its face. Well, that is what then — I mean, the Chief Justice said the reapportionment statute is that statute. Well, it isn't on its face, and that's — The districting statute is that. It would require, rather than using a traditional, well-developed standard, the Court would have to depart from its traditional, well-developed standard of evaluating viewpoint discrimination on the face of the statute, as it's done in recent cases where it doesn't — So if you hide the evidence of what you're doing, then you're going to prevail. Well, I don't think it's hiding by stating the statute for where the boundary lines are, as they've always been stated. That's not hiding what's being done. Well, let's talk about the boundary lines for a second. People have been talking about the statistics and the numbers. Is it appropriate in a case like this to look at what the district looks like in terms of the boundaries and the extent to which it complies with traditional redistricting criteria? I mean, part of the issue here is you have people from, you know, Potomac, who are joined with people from the far west panhandle. I mean, they both have farms, but the former are hobby farms, and the others are real farms. There's a lot in the record that you'll find that census considers most of the people in that western Maryland part of the State to actually live in urban areas, according to the census. But Congress abandoned the geographic requirements as early as 1911 was the last time they put contiguity and compactness in an enforcement statute. So it's not in the Constitution. It's not in the governing statute. But if you were going to look at that kind of traditional thing, then you'd have to look at it. Roberts. Well, it just seems to me, I've read a lot in the record of people worried about, you know, going over Chesapeake Bay and drawing a district, and that makes a lot of sense. But it's not just water that separates people. And part of the objection here, in the way it was redrawn, is that it's — it doesn't seem to have any internal logic. Well, it would be harder to justify what the plaintiffs want to call the benchmark district, which extended the 6th all the way across the State to far Harford County, which is as far from western Maryland as you can get without plopping into the Chesapeake Bay. So if you want to say, let's judge it by geographic and traditional methods, then you couldn't justify the benchmark district that plaintiffs want to point to, which is the old 6th. This new district looks much more traditional. In fact, it has Montgomery County in it, which was the traditional layout of the 6th district until that was changed in 1990, which paved the way for Roscoe Bartlett to be able to get elected, unlike his previous try for the seat where he lost by 49 points. Ginsburg. Mr. Sullivan, in the racial gerrymandering case, there was a period when Max Blatt was the effort. And it seems to me that what we have here is Max Democratic. And if Max Blatt was no good, why should Max Democratic be okay? There's a couple of reasons. One is factual that in this record it's uncontested evidence in the record that the legislators could have, without much difficulty, drawn a map that would have resulted in eight Democratic and zero Republican congresspersons. So factually, it's not a Max Dem plan. Secondly, in the other case, I believe you're concerned about racial gerrymandering, which is drawn from a history of exclusion of African Americans from our political process, something that Republicans can hardly claim, certainly not today, where our Democrats are a Republican party. So it's a much different process. Roberts. Roberts. You made just there, I meant to ask it before, a factual question. You said the State was 60-40 Democrat, Republican? Yes, Your Honor. But that's just an identified party. What's the percentage of independents in Maryland? Well, I'm not sure. In this particular district, it's about 20 percent in the 6th District. I do know that. It's 20 percent. Is that a pertinent consideration in deciding whether something's been a partisan gerrymander? Well, I think it's important because here both major parties are in the minority as far as registration in that district. Neither is the majority. They could have made it that way, but they didn't. So the independent vote is critical because in the election that the first election, the Democrat won more of the independent vote than the Republican. The redistricting lines couldn't have caused that to happen. That happened because of the views of those voters and the strength of that candidate. As a general matter in partisan gerrymandering cases, do you have any theory about how you're supposed to take independent voters into account? Well, I think they have rights, too. And I think what gets lost, certainly in plaintiff's theory, perhaps in some of the others, is what about all the people that aren't part of a major party? If they don't enter into the calculus for this First Amendment retaliation, presumably they're retaliated in every act of the legislation. Isn't it true, Mr. Sullivan, just as a matter of fact, that most people who are independents tend to lean pretty strongly one way or the other over many election cycles? Well, I've heard some analysts call them as the angry white vote, but I don't know if that's true. I don't know, particularly if you look at the election. I wasn't suggesting that they were anything in particular, just, you know, people who call themselves independents and, in fact, are not members of a political party, you know, tend to, not all of them, but many of them, tend to vote pretty consistently one way. And this is why, when mapmakers do their mapmaking, they look not only to party registration, they look to the way people vote. And what they find is that more members than just the members of the political party, more voters, vote pretty consistently. Well, I don't know if our record would support that. You may be correct, but the record, we have statements from experts in our, as Dr. Lichtman testified, that the independent vote tends to be a transitional period for voters who are unhappy with their former political party and they may or may not move to the other one. So we don't know which direction they're moving. Are they moving away from the Democrats and parking themselves as independents for a few years before becoming a Republican? Or vice versa, they're disenchanted with Republicans? Along the lines of things we don't know, we've been talking about the intent of the legislature. But what effect does the fact that this map was subsequently approved by the people themselves have when we're trying to determine intent? This went up for a voter referendum, as I understand it, and passed with 64 or so percent of the vote. Yes, and some of our plaintiffs were active in getting that referendum on the ballot. Well, in the Shewette case, Justice Kennedy wrote how that raises First Amendment issues of its own, because the people have spoken and they've expressed themselves and they did so overwhelmingly to support this plan, including in 10 out of 12 counties where the majority of voters are Republican. So for this is not, as many redistricting case might be presented to you as a blow for democracy, this would be a blow against democracy. What did the referendum question ask? It asked if the voters approved the plan that had been drawn up. Is that what it said? The plan that had been drawn up? I thought it was. Well, it's a more elaborate statement. What is a more elaborate statement? My point is you're relying on what the response to the referendum. And certainly, I think your friends on the other side suggest that the question the phrasing of the question on the referendum was opaque. Yes, Your Honor. That issue was litigated by the proponents of the referendum in State court, and they lost both at trial and on the appellate court in a case called Parrott v. McDonough that is cited in the Judicial Watch brief. The Court found that the language of the referendum was sufficient on its face to apprise voters, especially when viewed in conjunction with the individual notice that voters received from the Board of Elections for fully explaining the issue and the map as it existed. Now, here it is, I think, if my clerk got it right. Are you for or are you against the following text? Establishes the boundaries for the State's eight United States congressional districts based on recent census figures as required by the United States Constitution. Yes. Well, I mean, it doesn't even tell you there what establishes it. I mean, what? No, but they were sent a notice that it had a fuller explanation. Notice? Have you read all of the notice? I mean, maybe. Notice, but they do read the paper. And the plaintiffs themselves rely on, in their second amendment complaint, if you look at the fine print at the bottom of some of their maps, drawn from the extensive prex coverage in the run-up to the referendum, many of them critical of the map, talking about it as a gerrymander. This referendum was not held in a vacuum. And in Shewitt, the Court said we're not going to presume that the voters are not smart enough or well-informed enough to make their decisions. I got that point, but I have a different question, which is that I haven't thought of. And I'd say you may have it. I have not thought of the answer to this question. Let's suppose that you do have 100 percent district drawn to help the Democrats. And suppose also in the next election the Democrat was elected, not the Republican. Now, if you said that was unconstitutional, and there's no other reason given. All right. Now, in other words, extreme. If that's the holding of the Court, I'm not saying it would be, I'm just saying assume it, how would that hurt independents? Is there a way that would hurt independent voters, that holding? Well, if independent voters had supported that Democratic candidate on the merits of that candidate because they thought that candidate was the better candidate, as happened in the Sixth District when independent voters voted very heavily for the Democratic candidate, then you would be harming them if you were, I don't know if you're going to think about invalidating an election, which the Court has intended to do, but it would be hurting them as well and blaming them for a problem that they didn't create. We have found standards on things like how many, what's the burden of treating different political parties to a requirement of signatures to get on the ballot. And we've said in those situations we look to the nature of the burden, we look to the expense, we look to a variety of different factors to inform the seriousness of the burden. The First Amendment has worked well in those cases. Are you just merely suggesting it can't work well here because the redistricting process is so complex? Is that your only reason? Or is it what exactly makes it workable in one context, but not particularly in this one? Well, there's two parts of that, Your Honor, if I may. One is if we're looking at retaliation, which has never been used as a means of testing a statute. It's been used in the executive part of the government when it's employing people, when it's contracting, where speech, where the government's consideration of the protected speech and political affiliation is generally restricted. Whereas, when government enacts a redistricting statute, it's legislating, which always involves consideration of speech, including, of course, political speech. But if you're talking about more generally First Amendment law as it affects elections, the right of association, the right to proselytize, to organize, to get  But not to discriminate. To cast a ballot. You answer, Justice Kennedy, by saying you don't have a right to discriminate. Right. But those cases go up to the point of voting, but as far as I know, they don't address the results of the election, which is what partisan gerrymandering claimants care about. They're not claiming they didn't get to vote. They're not claiming their candidate didn't get on the ballot. They're not claiming any of those things that have been addressed. Sotomayor, but the whole purpose of a gerrymandering attack is that I am being discriminated against, or at least the theory of their case, because of the views I have expressed over time. And those views want to be silenced by the other side. But those are the same types of things that come up any time you're on the losing side of legislation, and this Court has repeatedly denied that opportunity to try to turn into a legal issue and a way to get redress the fact that one's views did not prevail in the legislature. Are you essentially saying, are you agreeing that gerrymandering is not justiciable? Well, we're arguing that on this claim that plaintiffs are bringing, the First Amendment retaliation, that it would not be a manageable standard. We're not stating that. Sotomayor, so go back to my question, why? Would you do you agree with the Court below that it can be made manageable if you introduce the test that it suggests plaintiff has to undertake? No. No. Because. So answer why. The Court there seemed to agree. Certainly, the dissent, Judge Niedlmeyer, thought it was manageable. But why do you disagree with the majority? The majority is basically saying it could be. It could be, though, but you have to prove these other things. It starts with a specific intent that retaliation requires. As the Court recognized in O'Brien, the intent when it comes to legislation is so diffuse. Many people are involved. Counsel, given their evidence, they certainly have enough to go to a jury on that question. Whether there really was any legislative intent outside of the gerrymandering. They don't have anywhere near the number of affidavits they would need from the legislators that actually voted or from the more than 1.5 million Marylanders who approved the plan in a referendum. That's the kind of diffuse intent that comes into play when you're talking about legislation. And here, legislation that's been taken to referendum. It's so far different from the kind of cases that the district court was citing where you have an employer and you know, I fired this employee, it's not very complex to figure out what the intent was and who did what, to whom. That's not what you're talking about with legislation. Kagan in the racial gerrymander cases, this is exactly what we do. In much harder circumstances, actually, I mean, it's the same in the sense that we look to what legislators say, we look to what map makers say. We look to a variety of pieces of circumstantial evidence about how the districting turned out, about what was done. And the reason I say it's harder there than it is here is because there we have to deal with the kind of confluence of race and politics. But here, when you look at this kind of maneuvering and it's all about what else is it except about politics, and we would look to the exact same things that we look to in our consistent line of racial gerrymandering cases. Well, I would refer you to plaintiff's expert. If you want to say that this is not involving the interplay between race and politics, you should look at the expert report in the record from plaintiff's expert, Dr. Morrison, who talks about one of the reasons that the plaintiffs are aggrieved is because of the makeup of the prior district was much less diverse, racially and ethnically, than the new district. And they are being forced to be part of a district with a more diverse population in Montgomery County. So I don't know if you can say, in this case. I think my main point was that we just, we do this. We do it when we deal with racial gerrymandering cases. Even if you want to say to me that this is no easier than that, I would say back, I guess I would argue with that. But my main point was, even if it's no easier, we do it all the time. But you do it under the Equal Protection Clause and not the First Amendment. That's where your cases will tell you. We would be looking at the same things. We would be looking at the same kind of direct evidence, the same kind of statements. We would be looking at the same circumstantial evidence that has to do with where the lines were drawn and how they were drawn. So it's all the same kind of evidence, isn't it? No, when you get to the end of the process, there needs to be a showing of totality of circumstances with historical and sociological evidence of exclusion of that minority, which simply is not the case when you're talking about Republicans. They have their major party. They've been in control of government oftentimes, and as they are now. I guess what I was suggesting was that we're looking to the same things to discover intent in each circumstance. You may be looking at similar types of evidence, but as far as I know, you have not applied the First Amendment retaliation rubric to that analysis, as plaintiffs want you to do here. Is there any series? One difference between the race and partisanship is that we've always recognized that a certain degree of partisanship is acceptable. We've never recognized that a certain degree of racial discrimination is acceptable. That's true, Your Honor, and it would be very hard if in the racial segregation law where the Court says you need to remove all vestiges, root and branch, this Court said in Beef that redistricting is root and branch political. How are you going to give it the same approach? Do you eliminate all evidence of partisanship? And if you can't eliminate all of it, how do you judge where the line is? And again, we get back to how plaintiffs have not presented the Court with a test that gives you that line. Breyer, we've had briefs in other cases that do try to answer that question pretty directly. You know, you look to see what the reason is and why is there partisanship, ask the defendant. And then given that reason, is there, you know, no real explanation? That just doesn't work. And you can, you know, these experts, you can run it through computers. You can get somebody who will look at this and they'll say, well, this is a – if this was the reason, why is it this is in the top 5 percent of doesn't satisfy the reason without the partisanship? You've read those briefs. Yes. Okay. And the problem is they're complicated, but not impossible, right? So that's why I'm back to where I start. I'm not saying it's impossible, and we're not taking the position that it's not possible for this Court to come up with a manageable standard. We're just trying to explain why this one isn't manageable and the Court has looked for so long. I would hate for it to settle on something less than a valid and workable standard. Unless there are further questions. Roberts. Thank you, counsel. Two minutes, Mr. Kimberley. I'd like to come back to something that Justice Kagan raised about intent. The fact is when it comes to legislative intent, this Court does it. When it comes to the question of burdens imposed on voting rights in the ballot access cases, this Court does that as well. Our position is that the burden properly understood under the First Amendment and applied in this context is the same burden that this Court has recognized in the ballot access cases. It's making it more difficult, deliberately making it more difficult for particular citizens to achieve electoral success because their views are disapproved by those in power, in this case in Annapolis. The Court having postponed jurisdiction, I think the question of justiciability is squarely presented to it. I understand that the Court has some concerns about the posture of the case coming up as a preliminary injunction. At the same time, I think the lower court is looking for this Court's guidance on whether the sort of approach that we proposed here is justiciable and it's one that the Court should proceed on. We would take the position that Justice — excuse me, that Judge Niemeyer took below that the appropriate approach is to think about whether citizens have been deliberately burdened because of the views that have been expressed in their prior voting histories. And I guess what I would say is if that — if that approach isn't going — is going to work in any case, it's going to work in this one, because here the evidence is unequivocal that this was the intent, and point in fact, the political composition of the district turned 180 degrees. It went from Republican to Democrat just as the map drawers intended. And if I could just quickly come back to a point, a concern that the Chief Justice raised at the argument in Gill v. Whitford. I think the average person on this street understands what partisan gerrymandering is about. It's about map drawers singling out individuals because of the way that they have voted and making it more difficult for them to achieve electoral success when plaintiffs — may I finish my thought? When plaintiffs succeed in proving that map drawers have succeeded in rigging an election, they ought to be entitled to relief. The average person on this street will understand that. For those reasons, we ask the Court to reverse. Thank you. Thank you, Counsel. The case is submitted.